UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DIANE FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 04 C 6458 |
| | ) | |
| PRINCIPAL FINANCIAL GROUP, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Charles P. Kocoras, District Judge:

This matter comes before the court on Defendant's, Principal Financial Group ("Principal"), motion for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, the motion is granted.

## BACKGROUND

We only consider those relevant facts that are presented in conformity with Local Rule 56.1 ("L.R. 56.1"). The alleged facts not properly before us or unsupported by the record have been disregarded. See Brasic v. Heinemann's Inc., 121 F.3d 281, 284 (7th Cir.1997) (refusing to consider the plaintiff's additional facts where not supported by specific references to the record).

Plaintiff, Diane Foster ("Foster"), was born on June 13, 1952 and is a resident of Aurora, Illinois. Principal is registered to do business in Illinois and has an office located in Oak Brook, Illinois.[1] Principal acquired the Oak Brook office in September 1999, when it purchased Old Northwest Agents ("ONA"). At all relevant times Principal's Oak Brook office was in the business of selling employee benefit programs and it houses two divisions, a group sales division and the financial division. Foster was initially hired as the Oak Brook Office Manager by ONA and continued her employment after the purchase by Principal. Foster primarily worked within the group sales division of Principal, until she was terminated on August 8, 2003.

Foster's responsibilities as Office Manager included working on proposals, submitting new cases to the home office, and making sure that the administrative staff performed the necessary tasks to assist the sales representatives. Foster was not responsible for meeting sales goals or developing sales strategies, and had very little contact with either outside brokers or customers. However, according to Foster's affidavit, she became familiar with all of the positions at the Oak Brook office by helping to train employees and substituting for absent employees.

In the later part of 2002, Principal conducted a reduction in force ("RIF") and, consequently, terminated Vicki Moss ("Moss"), a marketing support employee, who

---

[1] Principal Financial Group is not a corporation. The proper designation for the corporation is Principal Life Insurance Company.

was 60 years old at the time of said termination. Foster, as Office Manager, was directly involved in this RIF. Prior to Moss' termination, David Kapustka ("Kapustka"), Vice President of Group Sales, informed Foster of this impending RIF and directed Foster to begin to document Moss' job performance, in particular Moss' difficulty in learning new job requirements.[2] After said documentation, Kapustka instructed Foster that he wanted Moss terminated; however, Kapustka never indicated that Moss' age was a factor in this decision. Moreover, while conferring with Principal's Human Resource Generalist, Rhonda Kilkenny ("Kilkenny"), Foster never indicated that she thought Moss was being terminated because of her age.

While employed by Principal, Foster's superiors annually reviewed her job performance. According to Foster's 1999 performance review, several areas in which Foster could improve were noted including, but not limited to, building her relationship with the home office, providing better training for the employees that she supervised, and improving customer service. In 2002, Foster scored 2.8 out of 4.0 on her performance review. The reviewing manager, admitted that Foster had improved in

---

[2] Foster began to document Moss's deficient activities in October, 2002, and requested advice as to how to deal with Moss's continued inadequate job performance in November, 2002.

several areas[3], but noted that Foster still had some attitude problems and difficulty managing some of the employees' time.

Also in early 2003, Principal terminated another Office Manager, Pat Heath ("Heath") who, like Foster, worked in the Oak Brook office. Heath, however, had an entirely separate job from Foster, which other than sharing the same general title had little or nothing else in common. Heath reported to Stace Hilbrandt, not Kapustka, and Heath's job dealt with Retirement Services, not employee benefits as Foster dealt with. In addition to having jobs requiring a differing knowledge set, Heath chose to accept the severance package upon her termination.

In late 2002 or early 2003, Principal decided to replace the Office Manager position with two newly created positions and, as a result, the Client Services Director ("CSD") and Regional Client Services Director ("RCSD") positions were created. Applicants for the RCSD position were evaluated on: (1) job experience; (2) leadership skills; (3) understanding of the underwriting process; and (4) home office relationships. Principal was mostly concerned with the applicant's experience in working with clients, brokers and the home office.

---

[3] Evidenced by marked improvements in comments by the reviewing manager including, "DF has the respect of her team and handles them well." 2002 Performance Review, Kapustka.

Three individuals applied for the Oak Brook RCSD position, Foster, Denise Conner, and Cindy Close ("Close"). Principal's Regional Vice Presidents: Mike Robinson; Tom Nicholl ("Nicholl"); Steve Ursler; Andy Frantzl and Greg Mollman ("Mollman") made the RCSD hiring decision. Nicholl and Mollman conducted the RCSD interviews with Foster and the other candidates. Close was the unanimous choice for the position because she had been with Principal for over 8 years, starting as an underwriter and, subsequently, managing an underwriting team. The hiring Vice Presidents found that Close had strong relationships with the home office and had also worked with customers and brokers on tough renewals. In his deposition, Mollman indicated that Close possessed good leadership skills and fully understood the pricing process.

The CSD position, although similar to the office manager position, required a majority of the CSD's time to be devoted to face-to-face contact in the field with customers and brokers. According to the job description, the CSD was required to manage daily office operations, including the supervising of the sales staff and organizing the office. Additionally, as much as 65% of the CSD's time would be devoted to working outside the office and spending the night in other locations.

Both Foster and Sandra Medicino ("Medicino") applied for the CSD position. Medicino was then an Account Executive who delivered renewals, worked with sales representatives to help deliver proposals to agents, and made sure that clients

understood contract language. According to Close's deposition, she interviewed both individuals; however, Foster contends that the position was never advertised on the internet, nor was she made aware of the position. Close found Medicino to be the best candidate for the position because of her relationship with the home office, her ability to work renewals, and the mutual respect between herself, the sales staff and the agents.

Subsequently, in late January 2003, Foster accepted a position as the Senior Marketing Consultant in Principal's United Healthcare segment, a position that had been open since August 2002. As the Senior Marketing Consultant of United Healthcare, Foster worked with only one other employee, Vinee Nanda. Foster's duties as Senior Marketing Consultant included: providing marketing support for the sales representatives through daily contact, relaying relevant and accurate information to brokers to better assist their customers, and performing renewals.

Prior to Foster's termination, the Principal staff, including Foster, was informed that Principal had hired Allison Olcott ("Olcott") to fill a new marketing consultant position. Foster complained to Kilkenny that she was disappointed that she had not been considered for this position. Kilkenny informed Foster that she was not considered for the position because it paid less than what she was currently making and was two position levels below her current position. Kilkenny then asked Foster if she wanted Principal to reconsider the decision, to which Foster responded, "Don't you think it's a little late?"

In July 2003, due to a sales decline, Principal lost the United Healthcare sales contract and, as a result, decided to eliminate Foster's Senior Marketing Position which dealt with the sale of such. Foster received termination papers and a severance agreement, which was based on her Principal tenure and salary. Per the severance agreement, Foster had 21 days to consider and sign a release order to receive her severance pay.

On September 15, 2003, Foster filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and, on July 27, 2004, the EEOC issued Foster a Notice of Right to Sue Letter. On October 6, 2004, within the 90 day statute of limitations, Foster file the instant lawsuit alleging that Principal unlawfully terminated her position and retaliated against her in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"). 29 U.S.C. § 621, et seq.

## **LEGAL STANDARD**

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©. The moving party must identify the specific portions of the total record, which it believes establishes the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). This initial burden may be satisfied by presenting specific evidence on a particular issue or

by pointing out "an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Insolia v. Philip Morris, Inc., 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole in a light most favorable to the non-moving party and draw all reasonable inferences that favor the non-moving party. Anderson, 477 U.S. at 255; Bay v. Cassens Transport Co., 212 F.3d 969, 972 (7th Cir. 2000).

## **DISCUSSION**

Foster alleges that she was terminated in violation of the ADEA on account of her age and, in addition, the victim of Principal's discriminatory retaliation. However, Prior to addressing the substantive arguments submitted by the parties, it is important to note that the courts do not serve as "super-personnel department[s]" that evaluate

-8-

each and every decision made by an employer and determine whether the decision was prudent and fair. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997). The courts are empowered to determine whether an employer's conduct violates the law. Id. Under the ADEA, which Foster alleges Principal violated, employers are precluded from "discriminating against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's age…." 29 U.S.C. § 623(a)(1). Thus, in the case before us we must focus on whether Principal's employment decisions were motivated by prohibited age animus. It is not within our purview to decide whether, as a general matter, Foster's termination was the best decision to be made.

In order for an employee to defeat a summary judgment motion in an ADEA case, the employee can utilize the direct method of proof or the indirect burden-shifting approach defined in McDonnell Douglas Corp. v. Green, 411 U.S. 792. 801-803, 93 S.Ct. 1817 (1973). Attempting to show discrimination using the direct method "essentially requires [a showing of] an admission by the decision-maker that his actions were based upon the prohibited animus." Rogers, 320 F.3d at 753; Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000). The Seventh Circuit has held that a plaintiff can proceed under the direct method of proof with circumstantial evidence, Davis v. Con-Way Transp. Cent. Express, Inc., 368 F.3d 776, 783 (7th Cir. 2004); however, the circumstantial evidence "must point directly to a discriminatory reason

for the employer's action." Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003).

Alternatively, under the indirect method, the plaintiff has the initial burden of establishing a *prima facie* case. Krchnavy, 294 F.3d at 875. If she does so successfully, then the burden shifts to the defendant to provide a "legitimate nondiscriminatory reason" for the adverse employment action. Id. at 876. If such a reason is supplied, the plaintiff must then show that the employer's alleged legitimate reason is merely a pretext for unlawful discrimination. Id.

## A. Foster's Unlawful Termination Claim

Foster attempts to argue that her unlawful termination claim should survive summary judgment under either the direct or indirect method. However, although Foster contends that she has presented evidence of direct discrimination, upon a review of the record, it is evident that she has not presented sufficient evidence to proceed under the direct method of proof. Consequently, we turn to address her remaining arguments under the indirect method.

To establish a prima facie case of discrimination alleging unlawful termination, Foster must show that she: 1) is a member of a protected class, 2) was meeting her employer's legitimate work expectations, 3) suffered an adverse employment action, and 4) was treated differently than similarly situated employees outside of the protected class. Krchnavy v. Limagrain Genetics Corp., 294 F.3d 871, 875 (7th Cir. 2002). It

is undisputed that Foster is a member of a protected class of individuals and suffered an adverse employment action. Therefore, we are left to address whether she was meeting Principal's legitimate expectations and whether similarly situated employees, not members of her protected class, were treated more favorably.

First, Principal argues that Foster has failed to establish that she met Principal's legitimate expectations and submits Foster's performance reviews, documenting some attitude problems when dealing with other employees, as evidence that she was not. Although Foster admits that her performances were not exemplary, she contends they were not the real cause of her termination nor considered when hiring for the positions that she did not get. However, despite these bare allegations, Foster does not present any evidence to meet her burden of showing that she was meeting Principal's expectations. Regardless, Principal does not dispute the general notion that Foster was meeting the majority of her responsibilities, but submits that Foster's position needed to be terminated because the United Healthcare contract was lost and that she was not the most qualified applicant for the position she did not get.

Assuming that Foster was meeting Principal's legitimate expectations, she is also required to show that she was treated differently than similarly situated employees not within her protected class. In determining whether a certain employee is similarly situated to other employees, the court should consider whether the employees possess analogous attributes, experience, education, and qualifications and are in materially

parallel positions. Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-618 (7th Cir. 2000). While it is not required that the plaintiff show complete identity in comparing herself to a younger employee, she does need to show that a substantial similarity exists.

Foster points to two employees who she contends are similarly situated: Nanda and Olcott. First, although Foster alleges that she is similarly situated to Nanda, Foster admitted in her deposition that they each had their own separate duties pertaining to United Healthcare. Foster relies more heavily on the notion that she is similarly situated to Olcott who sought a job with Principal and received more favorable treatment than she. However, in actuality, the position that was filled by Olcott was a clerical position two levels below Foster which would have required her to not only to change locations[4], but also would have take a pay reduction. Accordingly, Foster has not established that a similarly situated employee, not a member of her protected class, was treated more favorably.

Even if it is found that Foster is able to establish a *prima facie* case using the indirect method, she still must show that Principal's reason for the termination, the decline in sales of United Healthcare products, was pretext for discrimination. Foster fails to do so and, once again, we are not in a position to micro-manage Principal's

---

[4] The new position was being offered in Bloomington, where as Foster's old position was in Oak Brook.

business decisions. Foster continually asserts that she was fired because of her age, and her termination had nothing to do with her lackluster job performance. Unfortunately, Foster's self-interested assertions concerning her abilities are not in themselves sufficient to raise a genuine issue of material fact and, therefore, summary judgment is appropriate.

## II. Foster's Retaliation Claim

Turning to Foster's retaliation claim, in order to establish a *prima facie* case of retaliation she must establish that: 1) she engaged in protected activity, 2) she suffered an adverse employment action, and 3) a causal nexus between the protected activity and the adverse employment action. Franzoni v. Hartmarx Corp., 300 F3d 767, 722 (7th Cir. 2002). Once again, it is undisputed that Foster suffered an adverse employment action; however, she fails to submit evidence that she either engaged in protected activity or that there was a causal nexus between such protected activity and the adverse employment action.

Although it could be argued that Fosters complaint to Kilkelly regarding Principal's decision to hire Olcott was protected activity, said complaint was made after Principal hired Olcott. Therefore, the activity Foster submits was discriminatory - Principal's hiring of Olcott could not have been caused by her complaint to Kilkelly. Furthermore, Foster presents no evidence that Principal's ultimate decision to terminate her employment resulted from her complaint to Kilkelly. Consequently, Foster has

failed to establish that the alleged protected activity caused the decision to hire Olcott instead of her. Therefore, without a showing of these fundamental elements, her claim for retaliation fails and summary judgment is warranted.

## **CONCLUSION**

For the reasons set forth above, Principal's motion for summary judgment is granted.

*Charles P. Kocoras*

Charles P. Kocoras
United States District Judge

Dated:   July 13, 2006